MARY JO KITTOK v. SBH
HOTEL CORPORATION
CV 05-6035 ER (PJWx) ✓

7/22/94

CLERK, U.S. DISTRICT COURT

FEB - 3 2006

CENTRAL DISTRICT OF CALIFORNIA
BY                          DEPUTY

SCANNED

Priority ✓
Send
Enter
Closed
JS-5/JS-6
JS-2/JS-3
Scan Only

THE CONDUCT OF TRIALS, A NEGLECTED AREA OF

JUDICIAL REFORM

By

EDWARD RAFEEDIE

UNITED STATES DISTRICT JUDGE

CENTRAL DISTRICT OF CALIFORNIA

I. ## INTRODUCTION

The purpose of this Article is to discuss a subject that has generally been

neglected by judicial reformers: the protracted trial and its causes. While the bench, bar,

and scholars are preoccupied with case backlog and calendar management techniques,

they have generally overlooked one of the principle contributors to judicial congestion;

the unnecessarily protracted trial. I refer to those jury trials that, all too frequently, last

for many months or even years. Almost all jury trials take from two to three times

longer than they should. I hope to show by this Article that this is easily avoided.

What is the problem? Slavish adherence to trial procedures which are outmoded,

inherently inefficient, and time wasting. These procedures, ranging from bench

conferences to the manner in which exhibits are handled, have become so

institutionalized as to have taken on the force of law. By custom and practice, we

adhere to these practices without question simply because this is the way it has always

been done. It is time for judges and lawyers to question whether there are better ways

DOCKETED ON CM

FEB - 3 2006

BY _____ 131

16

to conduct a trial.

The hope here is to demonstrate that these ancient procedures are not sacrosanct; that their time-wasting features may be ameliorated or totally diminished. The chief delay-causing procedures will be outlined and effective solutions which significantly shorten trials, without prejudice to any party, will be discussed. For want of a better nomenclature, it may be called "squeezing out the dead time."

The key is to insure that the jury will hear five or six hours of uninterrupted testimony every single day. This is what every court should seek to achieve. When that is accomplished, even the most complex trial will be concluded in one-third to one-half of the time estimated. This Article addresses how to achieve the ideal trial day. In a nut shell, courts, with the cooperation of lawyers, must abandon some of those practices which by training and experience have come to be treated as the law of the land. Let us discuss those practices that cause the greatest delays.

## II.        BENCH OR CHAMBER CONFERENCES

The chief cause of trial delay is the bench or chambers conference which interrupts the presentation of evidence to the jury. It is not an exaggeration to say, that if one examines the records of trials which have taken months, and in some cases years, it will be found that more time was devoted to conferences than is to presenting evidence to the jury. In such cases, the jury is asked to standby, either sitting in the jury box while the bench conference is held or, more often, being remanded to the jury room

2

to await the finish of the discussions between the judge and the lawyers.  Often this practice consumes the major part of the trial day.

The Atlanta Journal and Constitution reported a good example of this, where "[t]he jurors in the Rev. Marvin Gorman's $90 million slander suit against tel-evangelist Jimmy Swaggart were sent home for a day so the judge could hear portions of depositions that seem to be forever the center of argument over admissibility."[1]  Other more recent examples from national high-profile cases follow:

In the trial of two brothers charged with the murder of their parents,[2] numerous hours and days were devoted to hearing legal issues that might readily have been addressed before trial or during recesses.  Many of these hearings required the jury to wait in the jury room while they were concluded or, in some instances, the jury was given days off.  Many issues were known and publicly discussed in the press for several years, yet they appear to have been raised for the first time during the trial, often when the witness was first called.

In another recent high-profile case, one morning at 9:00 a.m., lawyers asked to see the judge in chambers.  The jury and witnesses were kept on hold.  The judge and counsel emerged at 11:45 a.m.  What were they discussing?  Counsel were arguing what, if any, restrictions should be placed on comments to the press. This is an issue that could have been decided at any recess.

---

1.   Joe Drape, Evangelists' Court Battle Losing Allure, Atlanta J. and Const., Aug 1, 1991, at A3.

2.   People v. Menendez, No. BA068880 (Cal. 1993).

In a recent internationally-covered case, a defendant had spent a full day ·

testifying and faced at least a full day of cross-examination the next day.  But, rather

than start the cross-examination, government counsel asked at 8:30 a.m. to have the

court determine whether the government could cross-examine defendant on a manuscript

he had written.  Two hours were devoted to this hearing while the jury and witnesses

languished.  The trial was, therefore, extended by that much time.  With a full day of

cross-examination ahead, there was absolutely no need to stop the trial in order to

decide this issue.  The court could have ordered it briefed or had a law clerk research it,

resulting in a better informed decision with much less pressure.

In my third Enrique Camerena trial,[3] the government was about to play a tape

and provide the jury with English translation transcripts.  These tapes had been admitted

in two previous trials after their authenticity and accuracy had been extensively litigated.

The tapes, the transcript, and their litigation history were available for nearly three

years.  Yet, defense counsel now, for the first time, objected to the authenticity of the

tapes, the accuracy of the transcript, the correctness of the translation, etc.  These are

complex issues that could take considerable time to resolve.  Should the court interrupt

the presentation of evidence in order to rule on these objections?  NEVER.

Government counsel was ordered to proceed to another matter or call a different

witness.  Objecting counsel was ordered to prepare a written motion setting forth all

specific objections, supported by legal memoranda.  Then, at a more convenient time,

the court could rule on the objections without impacting on the jury's time.  A judge

---

[3]. United States v Rafael Caro Quintero, No. CR-87-422(G)
      (Cal. 1987).

should never send the jury to the jury room while these issues are being resolved. Counsel do not have a vested right to have issues resolved on demand. The court controls the order of proof, and must exercise control to insure an efficient presentation of the case.[4] Incidentally, counsel who was ordered to brief the issues promptly withdrew his objections.

Of course, counsel have a right to be heard on all critical issues, but they do not have the right to pick the time and place. Hearings should not interrupt the presentation of evidence when they can be held without doing so. It is possible, with a little thoughtful planning and without prejudice to any party, to hear and decide all legal issues without disrupting the trial continuity. I recommended procedure: As early as possible before the trial, preferably by written order, the court should advise counsel that the court will not hold bench or chambers conferences during the trial, that it is the intention of the court that trial testimony will be presented without interruption for five or six hours each day, and that all legal issues of importance must be raised in advance of trial by written noticed motions. Issues which are of common knowledge because of prior publicity, or which are otherwise known to the court should be specifically identified. This will dispose of most major issues but, unfortunately, not all. Contrary to what one might expect, such an order does not produce a deluge of motions.

Some of the most vexing trial interrupters are motions which should have been made prior to trial, but which are voiced for the first time during or just before the presentation of evidence or testimony. Traditionally, the court has dismissed the jury

---

4.   <u>See, e.g.</u>, Civ Trials Manual Comm., Civ. Trials Manual
     § 1 (2d ed. 1984).

SCANNED

and considered the issues raised. In so doing, the court has lengthened the trial by the amount of time devoted to hearing these matters.

In every case, the court should set a motion cut-off date. The judge must be very emphatic that matters which are of critical importance (even evidentiary ones) must be filed on or before the motion cut-off date, and that they will not be considered during the trial without a strong showing that counsel could not, by the exercise of due diligence, have raised them sooner. The critically important issues are always well known and publicized in high-profile cases.

Several things happen when a court dispatches the jury to consider legal arguments; none of them are good. The trial becomes unnecessarily lengthened by the time devoted to the hearing. The jury loses its focus on the trial if it is unduly fragmented, often leading to a skewed verdict. By lengthening the trial, jury expenses are increased. Further, if counsel has been appointed, their fees are also increased. Jury dissatisfaction rises. What jurors dread most about jury service is the prospect of sitting around waiting. For this reason, I tell jurors during voir dire examination that the trial will not be interrupted to hear arguments and that they can expect to hear one witness after the other without a break in continuity. Many have written to me to express their appreciation of this procedure.

From the judge's standpoint, the worst possible result is that the judge is victimized by being asked to make important decisions in an atmosphere of duress without the opportunity for reflection or research. If the issue is important enough to warrant a hearing, then surely the judge must have some time to consider the matter in

SCANNED

a proper way. I have not been able to find a rational reason to support the ancient practice of bringing testimony to a halt, *in order to hear matters better heard before trial or during jury recesses.*

Once counsel understand the rules, they quickly adapt to them. The trial then takes on a beautiful rhythm which makes it a joy for the court, counsel, and, most of all, the jury. Counsel who return to court for a second case are always well-prepared to conduct the trial without interruption, and do so without complaint and without sacrificing the opportunity to be heard on any issue of importance.

Counsel should be directed to let the clerk know, either by sign or by note, that they wish to take a matter up with the court. When the jury is excused for the next recess, the court remains behind to hear counsel. These matters rarely take more than a few minutes.

Lawyers in the heat of battle are inherently combative. They want to be heard on every point, no matter how trivial or inconsequential. Invariably, issues that have not been anticipated come up during the trial. For example, the lawyer will ask a question of the witness, and there will be an objection. The lawyer will ask to be heard on the objection. If it is a trivial or ordinary evidentiary objection, there is no requirement for a hearing. The court should tell the lawyers in advance that it will not hear arguments on ordinary evidentiary issues. If it is something that is extremely critical to the case, and the lawyer feels it is absolutely necessary to be heard, then the court simply asks the opposing counsel to defer questioning the witness on the objectionable area until a ruling has been made on the objection at the next recess, which is never far away.

7

Interestingly, when counsel are offered the opportunity to be heard at the recess, more often than not, they withdraw the request. Many of the requests for hearings are reflexive and reactive, a product of the combativeness discussed earlier. After counsel have had an opportunity to cool off and reflect, they often realize that the matter was not so important after all. The judge who readily grants hearings on demand spends a good deal of time on trivial matters and loses part of the full day of testimony. If counsel still wishes to be heard, the court will hear arguments and make a ruling. Generally, the witness is still on the stand, and the subject may be reopened if the ruling dictates. The inefficient way to deal with this problem would be to dispatch the jury to the jury room while the argument is being heard, or, worse yet, to have them seated in the jury box while a whispering contest takes place at the bench. Both methods inject "dead time" into the trial which can never be recouped. Every moment that the jury is in the courthouse, except when they are on their recesses, they should be seated in the jury box hearing testimony.

To make sure that counsel have sufficient opportunity to anticipate legal issues, the court should direct that the names of all witnesses and exhibits expected to be used be disclosed to counsel forty-eight hours in advance of the time they are to be presented. Thus, counsel will have time to raise an issue relating to such witnesses or exhibits, the next day, either before the jury is in the box or during one of the recesses, but never as the witness is called.

The decision made by the judge after a bench conference is likely to be of a lesser quality than one made after some time for reflection, deliberation, or research. A

judge who is called upon to hear arguments at the bench, must render a ruling very quickly, often shooting from the hip, and relying almost entirely upon legal instincts.  By contrast, if an issue is sufficiently important to warrant a hearing, counsel are more likely to get an informed decision if the judge has time to reflect on and research the issue.

It is the least prepared lawyer who generally causes the most problems in this area.  I speak here of the "hip shooter" who has not thought out the case, has not reviewed the evidence and who, whenever a thought occurs, makes an objection and demands a hearing.

This lawyer will wait until the witness is called or until the first question is asked about  particular evidence before making an objection, despite the fact that the evidence may have been available  for many months, and the opportunity to bring a motion in writing, or even orally, existed before trial.   It is this less-than-diligent lawyer who takes up a disproportionate amount of time.  A good deal of the argument presented to the judge at a bench conference by this type of lawyer is frivolous -- without any authority or support whatsoever.  To the extent that judges permit interruptions by such lawyers, they are in effect rewarding the slothful at the expense of the diligent.  The well-prepared lawyer will have thought out the case in advance, will know the facts well in advance, will know the evidentiary problems that need to be raised with the court, and will, after direction from the court, bring them to the attention of the court in such a way as not to impact on the trial time.  Recent technology has purported to enhance the bench conference procedure in multi-party cases.  Lawyers are equipped with headphones and microphones and are able to communicate with the judge in the presence of the jury

without the need to assemble at the bench. While this has been hailed as a great step forward, I suggest that the opposite is true.

The use of these devices has increased the number of bench conferences because of the ease with which they may be held. The cumbersome attributes of the traditional conference are removed, i.e., there is no need for all counsel and the reporter to assemble at the bench nor for counsel to try to be heard by the judge without being heard by the jury. Even the judge is seduced by the ease of it all.

This technology has been used at least twice in the Central District. It is no accident that one of the cases was reputedly the longest ever held in this district, and the other was not far behind in longevity.

To demonstrate the effectiveness of these techniques recommended herein to shorten trials, five cases are cited below, both civil [5] and criminal. All could be characterized as multi-party, high-profile, complex cases. In each case, the estimated time for trial was four to nine months, yet the longest of these cases lasted only thirty-four days, including jury selection. In the antitrust cases,[6] over one million documents were produced before trial, and over 900 volumes of depositions were taken. These were document-intense cases. All counsel were highly professional, able practitioners. The lawyers involved in these trials had no difficulty dealing with these procedures. The trials were not fragmented so as to distract the jury. Most importantly **NOT A SINGLE BENCH OR CHAMBERS CONFERENCE WAS HELD WHICH IMPACTED ON THE**

---

[5].   See infra Appendix A.

[6].   See infra Appendix A (referring to In re Passenger Computer Reservation and Continental Airlines v. United Airlines).

JURY'S TIME in any of these cases. Day after day, the jury heard testimony for a full day.

Every lawyer was heard on every legal or evidentiary issue on which they sought a hearing. The court hours were routinely shorter than in most courts, 9:30 a.m. to 4:30 p.m.. There were no after-hour, evening or weekend sessions.

In singling out these complex cases by way of example, the author does not mean to suggest that the techniques discussed herein are only for the complex case; they can be used in every civil or criminal case with the same beneficial results.

Very often, this continuity is interrupted by a request from counsel to see the judge in chambers when the court is about to reconvene, often when the jury is already in the box. Such a request commonly occurs at the beginning of the trial day or the end of the noon recess. Such a request should never be granted. The court should have previously instructed counsel that no proceedings will take place that impact on the jury's trial time. The court should direct counsel to bring the issue up at the next recess.

Once the court sees counsel in chambers, the following usually occurs: First, my experience, acquired during my early years on the bench, (when I foolishly granted such requests) is that the matter which counsel wished to discuss with the court was of no great urgency and could have been dealt with at any time. Second, having attained the judge's ear, counsel now bring in what may be called "walk-in baggage," wherein they raise a number of other matters not mentioned when they first requested the conference, and for which there is no need for an immediate decision.

It is not uncommon for such chamber conferences to result in a loss of thirty or forty minutes of trial time. The efficient way to deal with the problem is to direct counsel to raise these issues at the time the noon or evening recess is taken, not after they have ended. In this way, the court can reflect upon the issues during the recess, if necessary, and provide a ruling before the court reconvenes.

## III.   MANAGING EXHIBITS

The way in which exhibits are handled can materially add to the length of a trial. When I first became a judge, the common practice in the state courts was for the lawyer to request permission to approach a witness with each exhibit.[7] The lawyer would then walk to the witness, leave the exhibit, and return to the counsel table. An enormous amount of time was consumed in this way, particularly in a document-intense case. The practice in the federal courts, when I arrived there in 1982, was for counsel to request that the clerk place a certain exhibit before the witness, whereupon the clerk would look for the exhibit, locate it, walk to the witness stand, and announce that "Exhibit 'A' is before the witness." This ritual would be repeated for each exhibit. These round trips to the witness can consume substantial trial time. Such procedures are inherently inefficient and unnecessary.

The better practice, to squeeze out this dead time, is to require counsel in

---

7.   Today, however, this practice has been relaxed to some extent. See Civ. Trials Manual Comm., supra note 4, § 83 (counsel may approach a witness to show a document or other object, but must request permission for other purposes).

advance of the trial, or at least before a witness testifies, to notify the clerk--preferably in writing--what exhibits the witness will be asked to testify about. The clerk then places those exhibits before the witness at the beginning of that witness' testimony, each clearly labeled. The witness is then asked to look at each exhibit before him or her, and is questioned about it. In a multi-document case, all documents are placed in tabbed notebooks which are placed in a book cart right next to the witness stand, within easy reach of the witness. The witness is then asked to look at an exhibit and is told in which of the numbered volumes it may be found.

If the cross-examining counsel intends to examine the witness on other exhibits, those exhibits are identified to the clerk and placed before the witness at the beginning of cross-examination. Unfortunately, in many courts, exhibits are still being handled in the same old manner, resulting in the infusion of wasted time.

IV.   **EXCEEDING THE SCOPE OF DIRECT OR FISHING WITHOUT A LICENSE**

In criminal cases, defense counsel will try to exceed the scope of direct examination for the purpose of going on a fishing expedition. This usually occurs with a witness who has not testified on the merits of the case. For example, a custodian of the records may be called by the government for the sole purpose of authenticating bank records. Each defense counsel will then seek to wring from the witness something of value not reasonably related to the witness' direct testimony, or credibility, and usually

13

not within the personal knowledge of such witness (e.g. "There's nothing in those records that show my client was stealing money, is there?").

These types of argumentative or rhetorical questions exceed the scope of the direct examination. Surprisingly, government counsel will often permit this to go on without objection. In a multi-defendant case, with each defense lawyer taking his turn at fishing, many valuable hours can be needlessly consumed. If the judge suffers in silence, the trial is lengthened.

The court should not permit counsel to exceed the scope of direct examination of such a witness and should interpose its own objection.[8] If the witness is one which a defendant intended to call as a part of the defense case, the judge has discretion to permit it.[9] But in the fishing cases, offers by the court to permit recall of the witness as a part of the defense case in chief are never accepted, proving that the examination was merely a fishing expedition. The court is not obliged to permit it. Under Rule 403 of the Federal Rules of Evidence, a court may exclude evidence which causes undue delay or waste of time.[10]

---

[8]. Fed. R. Evid. 403 (evidence may be excluded if it is a waste of the court's time or constitutes needless presentation of cumulative evidence).

[9]. See id.

[10]. Id.

14

## V.        EVIDENCE OF UNDISPUTED FACTS

Many trials are lengthened by the presentation of evidence of undisputed facts, and sometimes cumulative evidence of undisputed facts. For example, in the sheriff corruption trial,[11] the government called as its first witness a sheriff's captain in charge of personnel, seeking to prove the date each defendant joined the department and when each was assigned to the investigative unit. This witness did not testify regarding the merits of the case.

These facts were not in dispute. The star witness against the seven defendants was their own sergeant who surely could have established these facts. Inevitably, these facts would emerge.

Not unexpectedly, each of the seven defense counsel sought to cross-examine the witness beyond the scope of his direct examination. Some examples of this over-reaching cross-examination include such questions as:

1.    What was the function of this elite narcotic unit?

2.    What are the requirements for assignment?

3.    What is the history and background of the witness?

4.    Has the defendant lost his pension rights? and

5.    When was the defendant last paid?

This situation provides a good example of two ways in which a trial may be needlessly lengthened. First, calling the unnecessary witness and second, allowing free-wheeling cross-examination of the witness by seven lawyers. In this case, I put a stop to

---

[11].    United States V. Terrell Amers, No. CR 90-111 (Cal. 1909).

it by advising counsel that they may recall the witness during the defense case. No counsel asked to have the witness recalled.

The court must give some guidance to young prosecutors who almost always over-try their cases. In this instance, at a recess in open court, I suggested to the prosecutor that their first witness was really unnecessary, that the legal landscape of the case would have emerged with the testimony of their star witness and others. I directed him to review the projected testimony of the remaining witnesses and weed out those who were basically testifying to undisputed facts that would inevitably emerge during the trial. As to each witness, I told him to ask himself the following questions:

1. What facts do I need to elicit from this witness in support of my case in chief?

2. Are those facts in dispute?

3. Will these facts emerge without this witness?

4. Can a stipulation be used in lieu of the witness' testimony?

5. The ultimate question is: Is this witness really necessary?

Very often this type of discussion will heighten the sensitivity of the prosecutor to the court's desire not to waste time. They will frequently report to the court that they have significantly reduced the number of witnesses.

Remember, the unnecessary witness invites unnecessary cross-examination. Both will lengthen the trial.

Very often in a major fraud or conspiracy case, the defendants do not seriously dispute the existence of the fraud or conspiracy. Their defense is usually to challenge the evidence connecting them to the enterprise. This was true in all of the Camarena

16

cases where defendants were charged with the commission of a violent act in furtherance of a criminal enterprise.[12]  Not one of the defendants challenged the existence of the enterprise.  Nevertheless, in these types of cases, young government prosecutors will present cumulative evidence of the conspiracy or fraud.  When I encounter this type of case, I point out to the prosecutors that the existence of the conspiracy is not in dispute and that they should concentrate on evidence which tends to connect the defendants to the conspiracy.  Such an admonition has been effective.

## VI.   THE PROBLEM OF EXTENDED RECESS

When a judge returns to chambers for a recess, there is always a great possibility that he or she may become involved in chamber work, meetings with staff, administrative matters, or return of phone calls.  It is not uncommon for the judge to become so preoccupied as to lose track of the time and allow the recess to exceed the allotted time.  Inadvertently, the fifteen minute recess is expanded to thirty minutes, or sometimes longer.  This is irretrievable trial time.

To prevent this, the clerk of the court should be directed to place the jury in the jury box when trial is to convene or a recess is to end, and then to buzz the judge, indicating that the parties, counsel, and all jurors are in their respective places.  Knowing this, a judge is not likely to tarry in chambers while everyone in the court room is

---

[12]   United States v. Rafael Caro Quintero, No. CR 87-422(B) (Cal 1987); United States v. Rafael Caro Quintero, No. CR 87-422(F) (Cal. 1987); United States v. Rafael Caro Quintero, No. CR 87-422-(G) (Cal. 1987).

expectantly watching the door awaiting the judge's entry. This process eliminates the unintended trial delays which, in a lengthy trial, could amount to several lost trial days.

## VII.     JURY INSTRUCTIONS

The procedure used to settle jury instructions can have a great impact upon the length of a trial. In many courts, the practice is for every party to submit a separate set of requested instructions.[13] Many of these instructions will be duplicates, or say the same thing in different words. Many will be argumentative or formula instructions. When the evidence has been concluded, the court will then meet with counsel and laboriously go over each instruction, hearing arguments from counsel each in turn, and deciding which instruction to give. This process can take a week or longer. In the five cases listed below,[14] the jury instructions were settled in thirty minutes or less in the following way:

A standing order is given to all counsel in every jury case, usually at the scheduling conference. This order imposes on counsel the obligation to submit a joint set of agreed instructions.[15] If there are requested instructions upon which they are unable to agree, the objecting counsel is requested to state, in writing, specific objections, citing.

---

[13]. See, e.g., Cal. Fed. R. Cr. § 13.2.2; U.S. Dist. Ct. Local R. 13.2 - 13.3.1 (Central District of California).

[14]. See infra Appendix A.

[15]. See infra Appendix B - Order Re: Preparation of Jury Instructions ("(a) The parties are required to jointly submit one set of agreed upon instructions.") (emphasis added).

authorities, and any alternate instruction which counsel considers more appropriate. The court's staff or the judge will do the necessary research on disputed points of law. Rarely are these disputes on legal points. More often, they are semantic differences from which counsel believe they may derive an advantage. Very often, counsel will make a half-hearted effort to agree. The court should return the instructions and direct counsel to try again. Eventually, most instructions will be agreed upon, leaving very few for the court to decide.

At this point, the judge should decide on a tentative set of instructions and prepare copies for counsel. These will be given to counsel in advance of the conference to settle the instructions and usually before the evidence has closed. The court then meets with counsel to hear objections. Surprisingly, there will be very few. The process will not exceed fifteen minutes, and the court is ready to hear argument.

The manner in which counsel prepare instructions in the average case is helter-skelter. If limitations are not placed on counsel, they will throw at the court every formula and argumentative instruction having the slightest connection with the case. They will search old files and produce instructions from other cases, from colleagues' other cases, and from "how-to-do" books. If the court falls into the trap of reviewing every instruction from each counsel, and allowing counsel to argue each instruction, the process can be interminable. This is why joint instructions are necessary. Counsel will realize that many of the instructions, chosen in haste, are not appropriate and will therefore weed them out.

SCANNED

## VIII.    JURY SELECTION

Following is a typical scenario in a complex high-profile, multi-party litigation (civil or criminal):

A large panel of jurors is brought to the courtroom. They are immediately told, usually before anything else, that this case will last four to six months, perhaps longer. This pronouncement promptly strengthens the resolve of many of the jurors to find a way to be excused. Many come to court already feeling this way and this announcement convinces them to do so by any means necessary.

Each juror is individually examined regarding his or her ability to serve for the stated period. This becomes an educational process wherein each juror who is excused has educated the other jurors on what must be said and done to be excused -- once the judge has excused a juror on particular grounds, he can hardly deny another juror who has the same grounds. The judge exhausts one panel and sends for another, and yet another. The process can take many days and many jurors.

The Los Angeles Daily Journal, reported in a recent case that jurors are warned they may spend six months or more, and that jury selection will take three to four weeks. The pertinent part of the article follows:

> "Amid increased security, the criminal trial of financier Charles H. Keating, Jr. gets under way in Los Angeles Superior Court today with a warning that jurors may spend six months or more hearing and deciding the securities fraud charges.
>
> [The] Judge . . . estimated that jury selection alone will take three to four weeks, including the preparation of questionnaires to identify 20 panelists who will be able to sit "without hardship" in a trial expected to

run until next January.[16]

In the two <u>Camarena</u> cases and in the deputy sheriffs case,[17] I used a procedure, which proved useful, in time-qualifying a jury panel in approximately twenty minutes, thereby eliminating the need for individual questioning of jurors regarding their ability to serve for the period of time required.

The key here was not to tell the jurors how long the case would take until they had first been told of the positive aspects, and their interest in the case has been piqued. In the <u>Camarena</u> cases it basically went as follows:

> This case involves the kidnapping, torture and murder of an American Drug Enforcement Agent in Mexico. You may have heard about it. The defendants on trial are charged with those crimes and they have pled not guilty.

> As cases go, this may be the most interesting case on which you will ever have an opportunity to serve. I only regret that all of you cannot serve; only twelve jurors and six alternates will be chosen from the panel which ultimately qualifies for this case."

> To determine which of you qualify, I am going to ask some questions. But, before I do, let me tell you about the schedule of this case.

> We will not be in trial on Mondays, so jurors on the case will enjoy 3-day weekends throughout the trial.

> Our hours on Tuesday through Friday will be 9:30 a.m. to 4:30 p.m.

> All holidays will be observed [specify what those are; any known hiatus in the trial should be stated (e.g. Ninth Circuit Conference)].

---

[16]. Dick Goldberg, <u>Keating Trial Begins Amid Tight Security</u>, L.A. Daily J., Aug. 6, 1991, at 1, 9.

[17]. <u>See infra</u> Appendix A.

Please do not ask to be a member of this panel unless you are absolutely sure that you can serve for the requisite period. We don't want you on the panel unless you can serve without hardship.

When I say hardship, I do not mean inconvenience to yourself or your employer. I mean a severe unavoidable and irreversible hardship. Anyone claiming such a hardship may be closely questioned by me, and you will have to satisfy me of the severity of this hardship. Remember, the judge always knows when claims of hardship are not sincere.[18]

At this point, I tell the jurors that the case may take three to four months, maybe longer, and ask those who are able to serve to stand and hand their name cards to the clerk. In all of these trials, we had more jurors stand than we needed. We thus had a time-qualified panel, without the individual examination of each juror. It is extremely likely that had we examined each juror individually, the time qualified panel would have been the same. Experienced counsel understand this and concur in the procedure. When jurors are asked to serve for several months or more, the majority will have excuses sufficient to justify their exclusion. The judge does not often compel such people to serve.

In high-profile cases, it is usually necessary to determine how to deal with the issue of publicity. Having obtained a time-qualified panel, it is necessary to further qualify this panel to determine their exposure to pretrial publicity and the degree of prejudice, if any. Usually, the court will have already obtained from these jurors answers to questionnaires setting forth the nature and extent of exposure to pretrial publicity. The judge must determine whether it is necessary to separately examine each juror or

---

[18]. United States v. Rafael Caro Quintero, No. CR 87-422(B) (Cal. 1987); United States v. Rafael Caro Quintero, No. CR 87-422(F) (Cal. 1987); (transcripts on file with author).

whether to question the entire panel during voir dire.  Experience has shown that despite extensive pretrial publicity, few people have been tainted by it.  A surprising number of jurors do not subscribe to or read newspapers.  Many do not watch television news.  Those who do read concentrate on special sections such as sports, entertainment, or business.  Some merely skim headlines.  Few read beyond the first paragraph or two of a story.  In all the of the cases cited below,[19] we found no juror who could provide any details of what they had read or seen.  Some simply had vague recollections of hearing about the case, and others had not heard of these cases at all.

In the Ninth Circuit, at least, no precise rule prescribes the type of voir dire examination which is necessary to protect against prejudicial pretrial publicity.[20]  The appropriate scope and detail of the pretrial publicity voir dire should depend on the level of the publicity and the initial responses which are elicited from prospective jurors.  The extent and manner to which a district judge must question prospective jurors have been left largely to discretion, reversible only for clear error.

If the jurors' responses make it clear that few jurors have knowledge of the case, general questions to the entire panel are adequate.  However, if the jurors' responses indicate that the case has generated a substantial amount of publicity and prejudice, general questioning may prove inadequate.  In such cases, it may be appropriate for the court to conduct a careful, individual examination of each prospective juror, preferably

---

[19].  _See infra_ Appendix A.

[20].  United States v. Giese, 597 F.2d 1170, 1183 (9th Cir.), cert.denied, 444 U.S. 979 (1979).

23

out of the presence of the other jurors.[21]

This problem may have been put to rest for trial judges by the Supreme Court case of Mu'Min v. Virginia.[22] In Mu'Min, the trial judge merely asked, "[w]ould the information that you heard, received or read from whatever source, would that information affect your impartiality in this case?"[23] The Court held that the trial judge's refusal to question prospective jurors about the specific contents of the news reports to which they have been exposed did not violate the defendant's Sixth Amendment right to an impartial jury under the Fourteenth Amendment.[24]

The use of a juror questionnaire can prove to be particularly useful in evaluating the amount of publicity to which a prospective juror has been exposed. The point to be remembered is that the judge should be certain that separate individual voir dire is necessary before embarking on such a course.

IX.    OTHER SUGGESTED TIME SAVERS

The following are other suggestions to shorten time during trials:

1.    Do not allow witnesses either to draw diagrams or put markings on exhibits while the jury is in the box. Advise counsel beforehand that diagrams or exhibits should .

---

[21]. Silverthorne v United States, 400 F.2d 627 (9th Cir. 1968).

[22]. 111 S. Ct. 1899 (1991).

[23]. Id. at 1902.

[24]. Id. at 1903-08.

be drawn or marked by the witness before getting to the stand. The witness may then adopt the diagrams and markings and tell the jury what they represent.

2.   Enough witnesses should be present to insure a full day of testimony. There should be no "dead time" caused by running out of witnesses. Further, wasted time is eliminated by requiring the witness who is on the stand at the time of an adjournment or recess to be back on the stand when the court reconvenes. If a new witness is to be called, he or she should be seated in the front row, ready to be sworn.

3.   Prohibit counsel from paraphrasing each answer into a new question which asks the same thing -- we are all familiar with this practice which many of us have endured in silence. Some examples include:

(a) Do I understand you to mean that . . .?

(b)   Is it your testimony then that . . .?

(c)   Is it fair to say that  . . .?

(d)   Can we assume then that . . .?

This should be stopped as soon as it becomes apparent by telling counsel that the witness has already answered the question. Soon, opposing counsel begins to understand that these paraphrased questions have been asked and answered, and will make appropriate objections. There is no need to hear the testimony of the witness two or three times. Often these questions are rhetorical and purely argumentative. Most importantly, they use up necessary time.

4.   Scrutinize carefully the request to approach a witness. In a long trial, the

25

walk to and from the witness can take up substantial time.  Remember, the objective is the continuity of testimony without interruption.  Almost all such requests can be avoided.  Many such requests are unnecessary and the reason to approach can be handled in other ways.  The court should always ask the purpose for which counsel wishes to approach the witness and find a way to make it unnecessary.[25]

5.     Require all testifying agents to have any reports or declarations they have prepared with them on the witness stand.  This will avoid the scramble that takes place when the agent says he needs to see his report before he can answer, and no one can seem to find it.

6.     Equipment such as a video recorders or projectors, etc., should be set up and ready without the need to use up the jury's time.  Counsel should work that out with your court clerk.

7.     Require counsel to have their witnesses review all exhibits about which they will be questioned.  The following examples will demonstrate the wisdom of this requirement:  Counsel asks the witness to examine Exhibit Number One (a 50-page document) to determine if the defendant's name is mentioned.  Whereupon, the witness laboriously reads every page while the court, counsel, and the jury are in idle boredom.

---

[25]  For example, counsel is cross-examining the case agent using the agent's report, and asks the witness the date a search was conducted.  The agent is unsure.  Counsel then asks if the agent's report might refresh his recollection.  The agent says that it would, and counsel requests to approach.  In this situation, the judge should deny the request and direct counsel to stipulate to the date.

If the witness had previously read the exhibit, the question could be handled as

follows:

Question:    "Prior to trial, did I ask you to review Exhibit Number One to

determine whether the defendant's name appeared on it?"

Answer:    "Yes."

Question:    "Did you do so?"

Answer:    "Yes."

Question:    "Is the defendant's name mentioned anywhere in Exhibit Number

One?"

Answer:    "No."


X.        CONCLUSION

These recommended procedures are by no means exhaustive.  There will be other

methods available to carry out the objective of having testimony flow unimpeded.  The

judge must have this purpose in mind and should share it with counsel at the earliest

time.  Professional counsel will be eager to cooperate with the court and will adapt very

quickly.  The inept, the lazy, and perhaps the showboats, will grumble but they, too, will

cooperate.

Despite the fact that I write from a perspective of eleven years on the Federal

District Court, the readers should bear in mind that my perspective also includes

thirteen years on the state trial courts.  Many of the procedures discussed herein are

carryovers from my days on the superior court.  It is a myth, wrongly perpetuated, that the federal courts can adopt and implement procedures which the state courts cannot. The great success which many state courts have demonstrated in implementing the "fast track"[26] system is sufficient to disprove this myth.     --

---

[26]. _See, e.g._, L.A. Sup. Ct. R. chs. 12, 13.

## APPENDIX A

**MDL 667**        In re Passenger Computer Reservation Antitrust Litigation

Time Estimated:    4 to 6  months
Actual Trial Time:   32 days, including jury selection

**MDL 667**        Continental Airlines v. United Airlines Antitrust Litigation

Time Estimated:      As high as 9 months
Actual Trial Time:   34 days, including jury selection

**CR 87-422(B)**   U.S.A. v RAFAEL CARO QUINTERO, et al

The first of the Camarena cases - most witnesses spoke through
interpreters.

Time Estimated:     4 months
Actual Trial Time:   27 days, including jury selection

**CR 87-422(F)**   U.S.A. v RAFAEL CARO QUINTERO, et al

The second of the Camarena cases - virtually all witnesses
speaking through interpreters.

Time Estimated:      4 months
Actual Trial Time:   30 days, including jury selection

**CR 90-111**      U.S.A. v TERRELL AMERS, et al

A seven-defendant case against Los Angeles County Deputy
Sheriffs accused of skimming money from currency seizures.  Over 200
witnesses and hundreds of documentary exhibits.

Time Estimated:      At least 4 months
Actual Trial Time:   26 days, including jury selection.

**APPENDIX  B**

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

|  |  |
|---|---|
| Plaintiff(s), | No. C |
| vs. | ORDER RE: |
|  | PREPARATION OF |
| Defendant(s). | ·JURY INSTRUCTIONS |

All proposed jury instructions are required to be filed and served at least seven days before the trial begins, except for those whose need could not have been foreseen. IF POSSIBLE, THE COURT WOULD APPRECIATE THE SUBMISSION OF COMPUTER DISKS, IN ADDITION TO PRINTED COPIES, OF THE JURY · INSTRUCTIONS, IN EITHER WORDPERFECT 5.1 OR ASCII TEXT FORMATS. Jury instructions are to be submitted in the following format:

(a)  The parties are required to jointly submit one set of agreed upon instructions.  To this end the parties are required to serve their proposed instructions upon each other two weeks prior to trial.  The parties should then meet, confer and submit one complete set of agreed upon instructions.

(b) If the parties cannot agree upon one complete set of instructions, they are required to submit one set of those instructions that have been agreed upon, and each party should submit a supplemental set of instructions which are not agreed upon.

(c) It is not enough for the parties to merely agree upon the general instructions, and then each submit their own set of substantive instructions. The parties are expected to meet, confer, and agree upon the substantive instructions for the case.

(d) These joint instructions and supplemental instructions must be filed one week prior to trial. Each party should then file, two days before trial, its objections to the non-agreed upon instructions proposed by the other party. Any and all objections shall be in writing and shall set forth the proposed instructions in its entirety. The objection should then specifically set forth the objectionable material in the proposed instruction. The objection shall contain citation to authority explaining why the instruction is improper and a concise statement of argument concerning the instruction. Where applicable, the objecting party shall submit an alternative instruction covering the subject or principle of law.

(e) The parties are required to submit the proposed joint set of instructions and proposed supplemental instructions in the following format:

(i) there must be two copies of each instruction;

(ii) the first copy should indicate the number of the proposed instruction, and the authority supporting the instruction; and

(iii) the second copy should contain only the proposed instruction -- there should be no other marks or writings on the second copy except for a heading reading "Instruction No. ___" with the number left blank.

(f) On the day of trial the parties may submit a concise argument supporting the appropriateness of each parties' proposed instructions which the other party objected to.

(g) All instructions should be short concise, understandable, and neutral statements of law. Argumentative or formula instructions are improper, will not be given, and should not be submitted.

(h) Parties should note in jointly agreeing upon instructions that the Court generally prefers 9th Circuit Model Jury Instructions over Devitt and Blackmar.

(i) Parties should also note that any modifications of instructions from statutory authority, BAJI, or Devitt and Blackmar (or any other form instructions) must specifically state the modification made to the original form instruction and the authority supporting the modification.

(j) Failure to comply with any of the above instructions may subject the non-complying party and/or its attorneys to sanctions.

1  **IT IS SO ORDERED.**

2      **IT IS FURTHER ORDERED** that the Clerk of the Court shall serve, by United

3  States mail, copies of this Order on counsel for the parties in this matter.

4      DATED:

                 FEB - 3 2006

6  

7                          EDWARD RAFEEDIE
                    United States District Judge